**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                               )
B & G INVESTMENT PARTNERS LP    )
CORP.                           )
                               )
                  Plaintiff,    )
                               )
         v.                     )   Civil Action No. 03-2469(EGS)
                               )
TOMMY G. THOMPSON, Secretary    )
of the Department of Health and )
Human Services                  )
                               )
                  Defendant.    )
_____)


**MEMORANDUM OPINION**

Plaintiff B & G Investment Partners LP Corporation ("B & G") brings suit pursuant to the Social Security Act, 42 U.S.C. § 1395, _et seq._ and the Administrative Procedure Act ("APA"), 5 U.S.C. 551, _et seq._, against defendant, the Secretary of Health and Human Services, claiming that the agency's Provider Reimbursement Review Board's decision denying plaintiff reimbursement for rental and other expenses under Medicare was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law.  _See_ 5 U.S.C. § 706(2)(A).

Pending before the Court are cross-motions for summary judgment.  Upon careful consideration of the parties' motions, the responses and replies thereto, the relevant statutory and case law, and the entire administrative record, the Court is persuaded that the defendant is entitled to summary judgment and

plaintiff's Complaint will be **DISMISSED WITH PREJUDICE.**

I.   **Background**

A.   **Statutory Background**

Medicare is the nation's federally-funded health insurance program for the elderly and disabled.  *See* 42 U.S.C. § 1395, *et seq.*  Part A of Medicare authorizes payment for certain health care services, including payment to skilled nursing facilities ("SNFs").  Under Part A, service providers enter into a "provider agreement" with the Secretary.  42 U.S.C. §§ 1395cc, x(u).  A "fiscal intermediary," generally a private insurance company, reviews claims for reimbursement and administers payment to providers on behalf of the Secretary.  42 U.S.C. §§ 1395h(c)(1), 1395x(u).  At the end of each fiscal year, the intermediary reviews each provider's cost report and issues a notice of program reimbursement ("NPR"), stating the amount of Medicare reimbursement owed to the provider.  42 C.F.R. §§ 413.20(a), 413.24(a), (f), 405.1803.

If a provider disagrees with the Secretary's determination, issued by the intermediary, the provider may request a hearing before the Provider Reimbursement Review Board ("PRRB" or "Board"), assuming certain prerequisites are met, such as the amount in controversy.  42 U.S.C. § 1395oo(a); 42 C.F.R. §§ 405.1807, 405.1835.  The Board may hold a hearing and issue a decision, which may in turn be reviewed by the Secretary's

delegate, the Centers for Medicare and Medicaid Services ("CMS"), formerly HCFA, Administrator.  42 U.S.C. § 1395oo(f)(1); 42 C.F.R. 405.1875.  The final decision of the PRRB, or of the Secretary if he chooses to review the decision, may be challenged in a U.S. District Court with venue, pursuant to the APA.  42 U.S.C. § 1395oo(f)(1).

**1.   Reasonable Cost Reimbursement Under Medicare**

According to the defendant, during the time period at issue in this case, Medicare reimbursed providers on a "reasonable cost" basis.  42 U.S.C. § 1395f(b)(1).  "Reasonable cost" is defined as "the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services ..."  42 U.S.C. § 1395x(v)(1)(A).  The statute goes on to state that "reasonable cost" "shall be determined in accordance with regulations establishing the method or methods to be used, and the items to be included, in determining such costs..."  *Id.*  Not surprisingly, there are a host of regulations for determining "reasonable cost."  42 C.F.R. Part 413.  Moreover, the Secretary has published interpretations of the laws and regulations in the Provider Reimbursement Manual ("PRM") in order to give providers guidance in how the various regulations are applied.

2.    **The Related Party Rule**

Under Medicare, providers may seek reimbursement for
necessary and proper interest on capital indebtedness.  42 C.F.R.
§ 413.153(a)(1), (b), (c)(1).  However, if a provider borrows
from an entity related to the provider "through control,
ownership, or personal relationship," the interest is not an
allowable cost under the statute.  *Id.*

Similarly, "[c]osts applicable to services, facilities, and
supplies furnished to ... [a] provider by organizations related
to the provider by common ownership or control are includable in
the allowable cost of the provider at the cost to the related
organization," where "such cost ... [does] not exceed the price
of comparable services, facilities, or supplies that could be
purchased elsewhere."  42 C.F.R. § 413.17(a); PRM § 1000; *see
also* PRM § 1005 ("[t]he related organization's costs include all
reasonable costs, direct and indirect, incurred in the furnishing
of services, facilities and supplies to the provider," and
stating that "[t]he intent is to treat the costs incurred by the
supplier as if they were incurred by the provider itself."
Therefore, "if a cost would be unallowable if incurred by the
provider itself, it would be similarly unallowable to the related
organization.").

The related party rule applies to rental expenses.  *See* PRM
§ 1011.5 (noting that where "[a] provider ... lease[s] a facility

from a related organization," that "the rent paid to the lessor by the provider is not allowable as cost," but "[t]he provider ... would include in its costs the costs of ownership of the facility," including depreciation, interest on the mortgage, real estate, and taxes).

Under the regulations, a provider is "related" to another organization if "the provider to a significant extent is associated or affiliated with or has control of or is controlled by the organization furnishing the services, facilities, or supplies."  42 C.F.R. § 413.17(b)(1); *see also* PRM § 1002.1. "Control exists [where] an individual or an organization has the power, directly or indirectly, significantly to influence or direct the actions or policies of an organization or institution."  42 C.F.R. § 413.17(b)(3); *see also* PRM § 1004.3 ("The term 'control' includes any kind of control whether or not it is legally enforceable and however it is exercisable or exercised.  It is the reality of control which is decisive, not its form or the mode of its exercise.").  The regulations also provide that an immediate family relationship creates "an irrefutable presumption" of relatedness.[1]  PRM § 1004.

---

[1] For purposes of the regulations, "immediate family" means (1) husband and wife, (2) natural parent, child and sibling, (3) adopted child and adoptive parent, (4) step-parent, step-child, step-sister, and step-brother, (5) father-in-law, mother-in-law, sister-in-law, brother-in-law, son-in-law, and daughter-in-law, (6) grandparent or grandchild.  PRM § 1004.

According to the PRM, the purpose of the related party rule is: "(1) to avoid the payment of a profit factor to ... [a] provider through the related organization (whether related by common ownership or control), and (2) to avoid payment of artificially inflated costs which may be generated from less than arm's length bargaining."  PRM § 1000.

The regulations provide the following exception to the related party rule:

(d) Exception. (1) An exception is provided to this general principle if the provider demonstrates by convincing evidence to the satisfaction of the fiscal intermediary (or, if the provider has not nominated a fiscal intermediary, CMS) that -

(i)      The supplying organization is a bona fide separate organization;

(ii)     A substantial part of its business activity of the type carried on with the provider is transacted with others than the provider and organizations related to the supplier by common ownership or control and there is an open, competitive market for the type of services, facilities, or supplies furnished by the organization;

(iii)    The services, facilities, or supplies are those that commonly are obtained by institutions such as the provider from other organizations and are not a basic element of patient care ordinarily furnished directly to patients by such institutions; and

(iv)     The charge to the provider is in line with the charge for such services, facilities, or supplies in the open market and no more than the charge made under comparable circumstances to others by the organization for such services, facilities, or supplies.

(2) In such cases, the charge by the supplier to the provider for such services, facilities, or supplies is allowable as cost.

42 C.F.R. § 413.17(d); *see also* PRM § 1010.

**B.    Factual Background**

Plaintiff B & G Partners is the successor to Advisors Nursing Home Group I Corporation, formerly known as **Connecticut Subacute Corporation** ("CSC").  In addition to CSC, there are several entities and persons relevant to an understanding of the instant case:

1.    **Continuing Health Properties**, created in 1986, managed and operated three nursing homes: Subacute Center of Bristol f/k/a Forestville Health and Rehabilitation Center ("Forestville"), Brook Hollow Health Care Center ("Brook Hollow"), and Cedar Lane Rehabilitation Center ("Cedar Lane") until **CSC** took over in 1992.  Plaintiff's Statement of Facts ("Pl. Facts") ¶¶ 28, 58.  **Continuing Health Properties** was a wholly owned subsidiary of **New MediCo Holding Co, Inc.** ("New Medico"), a privately-held Massachusetts company, 100 percent of the stock of which was directly owned by **Charles Brennick, Gerald Martin's** cousin. A.R. 775.  **Barry Portnoy** was an attorney for **New Medico.** Pl. Facts ¶¶ 28-30.

2.    **Health and Retirement Properties Trust ("HRPT")**, established in 1986, is a publicly traded company formed to invest in real estate, specifically health care facilities.  Pl. Facts

at ¶¶ 7,9.  **HRPT** was sponsored by **New MediCo/Continuing Health Properties, Greenery Rehabilitation,** and **HRPT Advisors.**  The Declaration of Trust that governs **HRPT** requires that a majority of the Board of Trustees be Independent Trustees.  **Barry Portnoy** and **Gerald Martin** are **HRPT** Trustees and in addition there are three Independent Trustees.  Pl. Facts at ¶¶ 13-18.

3.   In 1986, **HRPT** purchased the three nursing homes from **Continuing Health Properties** and then leased them back to **Continuing Health Properites.** Pl. Facts ¶ 35.

4.   **HRPT Advisors, Inc.** does the day-to-day work of **HRPT,** pursuant to an Advisory Agreement entered into in November of 1986. Pl. Facts at ¶ 11.  **HRPT Advisors** is owned by **Barry Portnoy** and **Gerald Martin.** Pl. Facts at ¶¶ 11-12, 22.  **HRPT Advisors** was "compensated at an annual rate equal to .7% of [HRPT's] real estate investments up to $250 million and .5% of such investments thereafter."  A.R. 1269, 1304.

5.   Beginning in 1992, and during the relevant time period, **CSC** operated the Forestville, Brook Hollow, and Cedar Lane nursing homes.  Pl. Facts at ¶ 2.  **CSC** is a closely-held corporation owned by **Barry Portnoy** and **Gerald Martin.**  *Id.* at ¶ 3.

Thus, Messrs. Portnoy and Martin (1) are two of the five

8

managing trustees of HRPT (the lessor), (2) wholly own one of

HRPT's sponsors, HRPT Advisors, the organization that "provide[s]

management and administrative services with respect to the

ownership of health care and related properties" to HRPT, and (3)

wholly own CSC (the lessee).[2]  Mr. Martin was also the President,

CEO, Director, and controlling shareholder of Greenery, another

sponsor of HRPT, and he was the Treasurer of HRPT; Mr. Portnoy

was also a Director and shareholder of Greenery, and a partner in

the law firm of Sullivan & Worcester, counsel to HRPT, HRPT

Advisors, Greenery, New MediCo, Continuing Health, Mr. Martin and

Charles Brennick, "and certain of their affiliates."  A.R. 759,

771, 774.  According to HRPT's Prospectus, "Messrs. Martin,

Brennick and Portnoy jointly engage and/or have engaged in

numerous business and investment transactions in the health care

industry and in other businesses."  A.R. 775.

The HRPT Declaration of Trust provides that the Trustees

have the absolute power over the business of the Trust, but that

"Trustees are not and shall not be required personally to conduct

the business of the Trust" and that

> the Trustees shall have the power to appoint, employ or
> contract with any Person (including one or more of
> themselves or any corporation, partnership, or trust in
> which one or more of them may be directors, officers,
> stockholders, partners or trustees) as the Trustees may

---

[2] *See* A.R. 1300; *see also* A.R. 762 (HRPT Prospectus states "[s]ubstantially all of [HRPT's] operations, except investment decisions, will be conducted by [HRPT Advisors]").

> deem necessary or proper for the transaction of the business of the Trust.  The Trustees may therefore employ or contract with such Person (herein referred to as [HRPT Advisors]) and, consistent with their ultimate responsibility as set forth in this Section 4.1, the Trustees may grant or delegate such authority to [HRPT Advisors] as the Trustees may in their sole discretion deem necessary or desirable without regard to whether such authority is normally granted or delegated by trustees.

A.R. 716.

In 1986, when HRPT and HRPT Advisors were created, HRPT purchased Continuing Health Properties for $32 million and then leased the facilities back to Continuing Health at a monthly rate calculated to result in annual net payments equal to 12.62% of the acquisition price of each property.  *See* A.R. 173-74, 188, 756, 760.  For the same period, the rent for the nursing homes leased to Greenery was 10% of the acquisition price.  *Id.*

As part of the arrangement between HRPT and its sponsors, Greenery signed a "stand-by" management agreement which provided that if Continuing Health experienced financial problems, Greenery would step in to manage Continuing Health and supply capital to keep it going; HRPT paid a fee to Greenery for this agreement.  Pl. Mt. at 8; A.R. 145, 153, 757-58, 767.

In 1992, HRPT's Board voted to end the leases with Continuing Health and to lease the three nursing homes to CSC. A.R. 144, 547, 777, 780, 790, 1124, 1195.  CSC, owned by Martin and Portnoy, who also own HRPT Advisors, took over the operations, and the leases, of the nursing homes.  HRPT provided

10

CSC with an $8 million line of credit.  A.R. 1200-02, 1210-11, 1213-14.  All five of the members of HRPT's Board were present at the meeting when HRPT decided to replace Continuing Health with CSC; Martin and Portnoy participated in the discussions regarding how the Trustees should respond to Continuing Health's financial woes.  A.R. 777-83, A.R. 145, 164, 172.

**C.   Procedural History**

For fiscal years 1996 and 1997, the Forestville, Brook Hollow and Cedar Lane nursing facilities, owned by CSC, submitted cost reports to the fiscal intermediary, Anthem Blue Cross and Blue Shield of Connecticut ("Intermediary").  A.R. 9, 1422-1490. In a series of decisions, the Intermediary determined that CSC and HRPT were related parties and disallowed capital, interest, and rental expenses.  A.R. 1363-67, 1373-74, 1377, 1381-82, 1411-12, 1414-15, 1425, 1498.

**1.   The Intermediary's Decisions**

In its position papers, the Intermediary explained that it had denied Medicare reimbursement for rent expenses for Forestville for FY 1997 and for all three facilities for FY 1996. A.R. 386-93, 490-99.  The decisions first set out the relevant definitions under the regulations:

> Related to the provider means that the provider to a
> significant extent is associated or affiliated with, or
> has control of, or is controlled by, the organization
> furnishing the services, facilities, or supplies.
> PMR § 1002.1

Common ownership exists when an individual or
individuals possess significant ownership or equity in
the provider and the institution or organization
serving the provider.  PMR § 1002.2

Control exists where an individual or an organization
has the power, directly or indirectly, significantly to
influence or direct the actions or policies of an
organization or institution.  PMR § 1002.3

A.R. 496-97.[3]

The Intermediary then set out the guidelines for determining

common ownership or control:

1.   In determining whether a provider organization is
     related to a supplying organization, the tests of
     common ownership and control are to be applied
     separately.
2.   If the elements of common ownership or control are
     not present in both organizations, the
     organizations are deemed not to be related.
3.   The existence of an immediate family relationship
     will create an irrefutable presumption of
     relatedness through control or attribution of
     ownership or equity interests.

A.R. 497.

The Intermediary first concluded that there was common

ownership between the Provider (CSC) and the supplier (HRPT)

because Messrs. Martin and Portnoy collectively own 100% of CSC

and, as owners of HRPT Advisors, they had a 4.1% ownership

interest in HRPT.  A.R. 497.  In support of its conclusion, the

Intermediary cites PMR section 1004.1, which indicates that even

_____

[3] The Intermediary's position papers are substantially
identical in their format and findings - one for FY 1996 dealing
with one nursing home and the other for FY 1997 dealing with
three nursing homes.  Thus, for convenience, the Court will cite
to the latter.

a "substantially low percentage of ownership could still constitute significant ownership." A.R. 498.

The Intermediary also concluded that there was direct and/or indirect control between the parties. A.R. 498. The Intermediary noted Messrs. Portnoy and Martin, owners of CSC, made up 40% of HRPT's Board, and that HRPT's Declaration of Trust does not prohibit transactions between related parties or require that trustees with an interest in the transaction abstain from voting. *Id.*

As for indirect control, the Intermediary found that Portnoy and Martin had indirect control of HRPT because they own HRPT Advisors, the organization which provides investment, management, and administrative services to HRPT. *Id.* These advisory services, the Intermediary noted, would include decisions on leasing of HRPT's properties. *Id.*

Importantly, the Intermediary "concur[red] with the Provider that they should be reimbursed for some costs." Those costs would be limited to the cost of the related organization, i.e., HRPT. A.R. 499. The Intermediary noted, however, that "the Provider was requested to produce a complete analysis with supporting documentation of the actual costs to the related party. To date, this analysis has not been produced. The failure to produce this data, as required by CFR 413.24 ..., resulted in the Intermediary's disallowance of the Providers

13

[sic] costs in total." *Id.* Finally, the Intermediary concluded, "If the Provider produces a complete analysis with supporting documentation of the actual costs to the related party, <u>we would be willing to adjust the Providers cost reports to reflect those costs</u>." *Id.* (emphasis added). Thus, even as late as August 2001, plaintiff was given an opportunity to provide documentation of the costs to HRPT of owning the nursing facilities. A.R. 490, 499.

## 2.   **The PRRB's Decision**

The nursing homes appealed to the Provider Reimbursement Review Board, and the PRRB scheduled a hearing. A.R. 1355, 1369--76, 1377-78, 1414-16. In anticipation of the hearing, the parties filed position papers with the PRRB, laying out their respective positions. A.R. 383-93, 403-23, 490-99, 567-86, 601-02, 635-74.

In a decision dated September 29, 2003, the PRRB found that the Intermediary's disallowance of the rental and capital-related expenses was correct. A.R. 6-15. The PRRB's decision essentially consolidated three appeals: the FY 1996 denial of capital and interest expenses for Forestville, the FY 1996 denial of rent expenses for all three nursing homes, and the FY 1997 denial of rent, capital and interest expenses for Forestville. A.R. 7.

The PRRB set out the relevant framework in this manner:

14

Under Medicare regulations, a provider is entitled to
claim costs applicable to services, facilities, and
supplies furnished to the provider by organizations
related to the provider by common ownership or control
at the cost to the related organization as long as the
cost does not exceed the price of services or supplies
that could be purchased elsewhere.  The regulation at
42 C.F.R. § 413.17.  However, there is an exception to
this rule.  42 C.F.R. § 413.17(d)(1) provides that the
charge made by the related supplier to the provider is
allowable as "cost" provided the following criteria are
met:

(i)     The supplying organization is a bona fide separate
        organization;
(ii)    A substantial part of its business activity is
        transacted with others than the provider and
        organizations related to the supplier and there is
        an open competitive market for the type of
        services furnished by the organization;
(iii)   The services are those that commonly are obtained
        by institutions such as the provider from other
        organizations and are not a basic element of
        direct patient care;
(iv)    The charge to the provider is in line with the
        charge of services in the open market by the
        supplier to the provider.

A.R. 8.

Next, the PRRB decision discussed the Providers' arguments
as to why the Intermediary's decisions should be reversed.  A.R.
10.  First, the Providers argued that CSC and HRPT are not
related parties because the regulations require a "significant"
relationship between the parties in order for the rule to apply,
and that in this case there was no showing of a "significant"
relationship.  *Id.*  The Providers insisted with regard to common
ownership that Martin and Portnoy's ownership interest in HRPT,
4.1%, was insufficient to meet the standard for common ownership.

15

As for common control, the Providers maintained that HRPT was governed by its Board of Trustees - a majority of which had to be independent trustees - and that the Declaration of Trust explicitly provides that the transactions between the Trust and interested parties must be approved by a majority of the Trustees not so interested. *Id.*

Second, the Providers alleged that even if the PRRB was to find that CSC and HRPT were related, the leases were actually negotiated in 1986 between unrelated parties - Continuing Health and HRPT - and thus, because CSC effectively assumed the leases on the same terms as had been negotiated between Continuing Health and HRPT, they were not related party leases.  A.R. 11.

Third, the Providers submitted that even if CSC and HRPT were found to be related parties, the exception should be applied because (a) the parties are bona fide separate organizations; (b) a substantial part of HRPT's business activity at all relevant times, 1986, 1992, and 1996 when it was audited, was conducted with organizations with which it was not related, and, moreover, in 1986, when the lease was negotiated, Continuing Health would have had alternatives for obtaining financing; (c) that it is common for providers to lease, rather than own, health care facilities; and (d) charges to the Providers were "in line" with the charges for services, facilities or supplies on the open market.  A.R. 11-12.

After a summary of the Intermediary's findings, the PRRB found that the Providers and HRPT were related parties for purposes of the regulations. A.R. 13. The decision cited the relevant definitions:

> (b) Definitions. (1) Related to the provider. Related to the provider means that the provider to a significant extent is associated or affiliated with or has control of or is controlled by the organization furnishing the services, facilities, or supplies.
>
> (2) Common Ownership. Common ownership exists if an individual or individuals possess significant ownership or equity in the provider and the institution or organization serving the provider.
>
> (3) Control. Control exists if an individual or an organization **has the power, directly or indirectly, significantly to influence or direct** the actions or policies of an organization or institution.

A.R. 13-14 (emphasis added).

First, the PRRB <u>reversed</u> the Intermediary's finding of significant common ownership. *Id.* With regard to control, however, the Board did conclude that the Providers and HRPT were related parties. A.R. 14-15. Noting at the outset that "it can not look at the audited years, December 31, 1996 and 1997, in isolation[,]" the PRRB found the following factors to be relevant:

> (1) In 1986, when HRPT was created, it initially conducted business with its three sponsors (HRPT Advisors, Inc., Greenery and New MediCo[/Continuing Health]), all of which were owned by the Provider's shareholders and a relative who owned New MediCo. HRPT (through HRPT Advisors) created a stand-by management

17

agreement whereby Greenery would be called on to manage
Continuing Health (successor to New MediCo).  Although
never implemented, this agreement imposing an
obligation is indicative of control.

(2) The prospectus for HRPT indicates that substantially all
of the Company's (HRPT's) operations will be conducted by
HRPT Advisors (owned by the Provider's shareholders).
Furthermore, the prospectus at Intermediary Exhibit 1, page
18, states that HRPT will be subject to various conflicts of
interest arising out of its relationships with its sponsors
and their affiliates.

(3) The prospectus indicates that 'to the extent that the
terms of the mortgage-financing, acquisition and lease of
the Properties have been negotiated among related parties,
they have not been determined on an arms-length basis.

(4) The financial statements of HRPT indicate that HRPT
Advisors, Inc. is considered to be affiliated with the
Providers based on common ownership.

A.R. 14.

   The Board explicitly rejected the Providers' argument that

CSC had merely taken over the leases which were negotiated by

unrelated parties.  *Id.*  The Board found that

    the principals of HRPT Advisors, Inc. (who are the
    Providers' shareholders) were in the position of
    dealing with themselves as owners of [CSC].
    Specifically, the Providers' shareholders have <u>indirect
    control</u> of HRPT since they are also the owners of HRPT
    Advisors, Inc., which provides management and
    administrative services to HRPT.  This makes them
    responsible for providing advisory services to HRPT
    that would include decisions on the leasing of HRPT
    properties.  The Board finds that a related party
    relationship <u>existed between HRPT and its various
    affiliates at the time the original leases were signed
    and extended to the years at issue</u>.

A.R. 14-15 (emphasis added).

The Board went on to find that the Providers were not

qualified for the exception to the related party rule.  A.R. 15.
First, the PRRB found no evidence in the record to support the
Providers' contention that a significant portion of their
business activities were conducted with unrelated entities.  *Id.*
Moreover, the Board cited the Intermediary's survey, which
disclosed that rental charges for the Forestville facility were
far in excess of the average rental expenses for other skilled
nursing facilities in Connecticut.  A.R. 15; *see also* A.R. 476-77
(Intermediary's 1998 letter to Providers' counsel stating that it
had "surveyed all of the [SNFs] which this office serves as the
Fiscal Intermediary in the Hartford, Connecticut MSA and have
found that the capital per diem average for FY 1996 is $13.78 and
the average cost per square foot is $15.87 compared to the
capital per diem of $38.24 and cost per square foot of $65.13 for
Forestville Health for the same fiscal year").  Even recognizing
that a rehabilitation facility might require a higher rental
rate, the Board found that the Providers had not submitted any
evidence to refute the finding that their rent was out of line
with similar providers.  A.R. 15.

     Moreover, the Board noted that the Providers had not
submitted any evidence that they had negotiated with any other
Real Estate Investment Trusts ("REITs") to find alternative
financing or capital.  *Id.*

     Finally, the Board concluded that the Providers had failed

19

to provide any documentation of ownership costs, which would entitle them to some reimbursement, and thus, the Board was "precluded" from allowing any costs because the Providers had not complied with the regulations' record-keeping provisions, 42 C.F.R. §§ 413.20(a) and 413.24(a).  A.R. 15.

On November 24, 2003, the Administrator for the Centers for Medicare and Medicaid Services (formerly HCFA), declined to review the PRRB decision.  A.R. 2.  This lawsuit followed.

## II.  Standard of Review

Summary judgment is granted pursuant to Fed. R. Civ. P. 56 only when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The Court views the evidence in the light most favorable to the nonmoving party, according the party the benefit of all reasonable inferences.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Thus, in ruling on cross motions for summary judgment, the Court will grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not in dispute.  *See Rhoads v. McFerran*, 517 F.2d 66, 67 (2d Cir. 1975).

In a review of agency action pursuant to the APA, the Court must determine whether the challenged decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law." 5 U.S.C. § 706(2)(A). In reviewing an agency's action, the Court must engage in a "thorough, probing, in-depth review" to determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *See Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415-16 (1971). However, while the Court's inquiry must be "searching and careful," the standard of review is also a highly deferential one; the agency's actions are "entitled to a presumption of regularity," and the Court cannot "substitute its judgment for that of the agency." *Id.* at 415-16.

## III. Discussion

In this suit, plaintiff again argues that (1) the related party rule should not have been applied in this case; (2) if the related party rule applied, CSC should have qualified for the exception; and (3) even if the rule applied and the criteria for the exception were not met, the nursing homes should at least have been reimbursed for some reasonable rental, capital and interest expenses. These arguments will be discussed in turn.

### A.   Whether the PRRB Correctly Applied the Related Party Rule

Plaintiff maintains that there is no showing of <u>significant</u> control in this case.[4]  Pl. Mot. at 18.  Plaintiff contends that

---

[4] Plaintiff's motion also makes arguments related to common ownership.  Because the PRRB expressly found that there was insufficient evidence to support a finding of common ownership,

when the original leases were negotiated in 1986, Continuing
Health and HRPT were not related, and thus, because CSC took over
the same leases in 1992, there cannot be a finding of control.
*Id.*  They note that Continuing Health was a wholly owned
subsidiary of New MediCo, which was owned by Charles Brennick,
that neither Martin or Portnoy owned any portion of New MediCo,
that neither Martin or Portnoy or any of HRPT's trustees were
officers or directors of New MediCo or Continuing Health, and
that none of New MediCo or Continuing Health's officers or
directors held any positions with HRPT.   *Id.* at 19.

Plaintiff principally looks to *Biloxi Reg'l Med. Ctr. v.
Bowen*, 835 F.2d 345 (D.C. Cir. 1987), for support.  In *Biloxi*,
the U.S. Court of Appeals for this circuit considered a challenge
to the PRRB's determination that the parties were related for
purposes of Medicare reimbursement.  *Id.*  The district court
granted summary judgment for the Secretary, but the appellate
court reversed.  *Id.* at 348-51.  Plaintiff Biloxi Regional
Medical Center ("Center") entered an agreement with the city and
several other entities, including the American Medical Management
Hospital Group ("AMM"), to assume operation of a hospital.  *Id.*
at 347.  As part of the agreement, plaintiff took over a lease,

_____

and thus only the issue of control is before the Court, this
opinion will focus on whether the Board correctly determined that
there was significant control between the Providers and the
supplier.

22

with certain revisions, with the city which had provided the former hospital with a rent-free term of twenty-five years. *Id.* The agreement also designated AMM as the Center's management group and guarantor. *Id.* One revision to the lease required that the Center pay rent to the city at an amount established by an independent appraiser. *Id.* at 347-48.

The Center did pay rent, at the rate established by the appraiser, and thereafter submitted a Medicare cost report to its fiscal intermediary. *Id.* at 348. The intermediary denied the rental costs on the grounds that the Center and the City were related by common control. *Id.* The PRRB affirmed, in part because the agreement provided that when the lease expired, the Center's proceeds would revert to the city. *Id.* The Board also noted that the mayor had the power to approve or reject candidates selected by AMM for positions on the Center's Board of Directors, the city had agreed to assist the Center through bonds with financing a new facility, the agreement provided that the city would take title to all the Center's assets at the end of the lease, a statement in the agreement noted that it would be in the best interests of the city to leave the hospital to the new hospital (another signatory of the agreement), and the city's extension of the deadline by which the Center was to complete the new facility. *Id.*

The district court found the fact that the city's mayor

could approve or reject four members of the Center's Board as determinative on the issue of relatedness and granted summary judgment. *Id.* The Court of Appeals reversed, noting

> Our examination of the mayor's power convinces us that the City was willing to accept a very modest role, however. Although not dispositive, we note that the 'control' envisioned by the District Court remained entirely potential; affidavits by the current and former mayors of the City indicate that they approved all the candidates selected by AMM without any independent investigation of their background.

*Id.* at 351. Moreover, the court found that the mayor's power was limited to vetoing candidates for a minority number of the board's seats. *Id.* The court also found it "extremely unlikely" that any directors would seek to curry favor with the city in order to retain their positions, and noted that the intermediary's decision had relied on a regional office's determination that "any approval of Board Members by the Mayor of Biloxi is a mere formality as AMM does the actual selections." *Id.* at 351-52. The Court of Appeals went on to discuss the other factors relied upon by the PRRB and found them not probative of control. *Id.* at 352-53. The *Biloxi* court did state, however, "[w]e realize, of course, that the District Court was properly concerned *not with the actual but with the potential* ability of the City to influence the Center." *Id.* at 352 (emphasis added).

In the instant case, the Court is convinced that the PRRB's decision is supported by sufficient evidence of control, as distinguished from the vague and remote elements of potential

control found in the *Biloxi* case.  Messrs. Portnoy and Martin had
concrete opportunities to influence HRPT's decisions based on
their ownership of HRPT Advisors, they had financial stakes in
the agreements between HRPT and the Providers both as owners of
CSC and as owners of HRPT Advisors, which, under the agreement
with HRPT, was remunerated based on HRPT's profits, and they
themselves were two of the five members of HRPT's Board of
Directors.  These factors fully support a conclusion that Portnoy
and Martin had the "potential ability ... to influence" CSC and
stand in stark contrast to the "mere formality" in *Biloxi* whereby
the mayor could approve or reject a minority of board members
suggested by the managing facility.  *See id.* at 351-52.

1.    **The Stand-By Management Agreement**

Next, plaintiff contests each of the factors relied upon by
the PRRB in its finding of control.  Pl. Mot. at 22-32.  For
example, plaintiff insists that the stand-by management agreement
between Greenery, HRPT, and Continuing Health was never
implemented and was simply something required by HRPT's
underwriters because New MediCo had emerged from bankruptcy
several years prior.  *Id.* at 22.

The regulations provide, however, that control exists "if an
individual or an organization has the power, directly or
indirectly, significantly to influence or direct the actions or
policies of an organization or institution."  PRM § 1002.3; *see*

*also Biloxi*, 835 F.2d at 352 (stating that it is not the "actual" but rather the "potential" ability to influence that is the issue).  The stand-by agreement that Greenery - where Martin and Portnoy were directors - would take over for Continuing Health if necessary, combined with Martin and Portnoy's roles at HRPT Advisors - who would presumably be the ones to "advise" HRPT to end its contract with Continuing Health and allow Greenery to take over - provides substantial evidence of at least the "potential" for significant influence.  *See id.*

Finally, while the familial relationship of cousin does not establish the "irrefutable presumption" of relatedness for purposes of the regulations, the Medicare regulations clearly recognize that familial relationships in supplier-provider transactions create at least the opportunity for influence.  *See* PMR § 1004.  Thus, it was not inappropriate for the PRRB to consider Brennick's ownership of New MediCo and Continuing Health and his role in the 1986 transaction with HRPT, given the fact that Martin and Brennick were cousins.  This factor is all the more significant in light of HRPT's candid acknowledgment that "Messrs. Martin, Brennick and Portnoy jointly engage and/or have engaged in numerous business and investment transactions in the health care industry and in other businesses."  A.R. 775.

## 2.   The HRPT Prospectus

Plaintiff submits that the PRRB incorrectly relied on HRPT's

26

Prospectus and numerous statements in that document, such as "to the extent that the terms of the mortgage-financing, acquisition and lease of the Properties have been negotiated among related parties, they have not been determined on an arms-length basis." A.R. 14.  Plaintiff argues that this is not an admission that the parties to the 1986 agreements were related, and, "most significantly," that because the Prospectus was prepared pursuant to the securities laws, not the Medicare reimbursement laws, the statements should not have been relied upon by PRRB.  Pl. Mot. at 24-26.

Plaintiff does not cite a single case or regulation, however, to support the notion that the PRRB cannot consider disclosures made for purposes of the securities laws as evidence of relatedness and control.  It is clear from the Board's decision that it did not simply take HRPT's Prospectus as conclusive evidence or admission of relatedness for purposes of applying the related party rule, but instead considered the statements in the Prospectus in the context of the other evidence in the record, such as the Advisory Agreement, the lease agreement, and the financial data, to reach its conclusion that HRPT and CSC are related parties for purposes of the Medicare reimbursement laws.  The Court finds that the Board's consideration and interpretation of the Prospectus is reasonable and supported by the record.  *See Consolo v. Fed. Mar. Comm'n*,

383 U.S. 607, 620 (1966)(stating Supreme Court's holding that the APA gives a reviewing court the authority to set aside an agency's ruling only if it is found to be arbitrary, capricious, an abuse of discretion, or unsupported by substantial evidence); *see also Universal Camera Corp. v. Nat'l Labor Relations Bd.*, 340 U.S. 474 (1951).

**3.   Indirect Control Through HRPT Advisors**

Plaintiff argues that the Declaration of Trust, declaring that the trustees have the ultimate control over the Trust and all transactions with an interested party must be approved by a majority of non-interested trustees, refute the PRRB's conclusion that Portnoy and Martin had indirect control over HRPT.  Pl. Mot. at 31-33.

Reliance on the Declaration of Trust is a double-edged sword for plaintiff.  That document also provides that "Trustees are not and shall not be required personally to conduct the business of the Trust" and that they may therefore "grant or delegate such authority to [HRPT Advisors] as the Trustees in their sole discretion deem necessary or desirable without regard to whether such authority is normally granted or delegated by Trustees." A.R. 716.  The Declaration of Trust also explicitly provides that HRPT Advisors does not have to present any particular investment opportunities and even protects HRPT Advisors from taking advantage of such opportunities itself.  A.R. 717.  Thus, this is

28

not a document that strictly protected HRPT from any self-dealing.  Moreover, HRPT Advisors was remunerated through a formula that was based on HRPT's investments, providing an incentive to Martin and Portnoy to find high-paying rental investments.  H.R. 773.  Thus, they were potentially in the position of dealing with themselves and "essentially negotiating on both sides of the transaction."  *See Kidney Ctr. of Hollywood v. Shalala*, 133 F.3d 78 (D.C. Cir. 1998).

In *Kidney Center*, the Court of Appeals reviewed a challenge to a determination by the HCFA Administrator, on behalf of the Secretary, that plaintiff health care provider was not entitled to reimbursement for certain costs under the related party regulation.  After a series of transactions between a number of corporations, Management Investors and Grace corporations could each choose four of the eight directors of a third corporation, NMC Holding.  *Id.* at 83.  A number of officers and directors of the former corporation held the same positions with NMC Holding. *Id.*  In its review, the court first noted the Secretary's guidelines in PMR § 1004.3, "[t]he term "control" includes any kind of control, whether or not it is legally enforceable and however it is exercisable or exercised.  It is the reality of the control which is decisive, not its form or the mode of its exercise."

The appellate court went on to find that there was

29

certainly substantial evidence in the record supporting
the Secretary's anterior determination that the
Management Investors had the power significantly to
influence the actions of both Old NMC and NMC Holding.
That finding is itself sufficient to support the
Secretary's conclusion that the firms were related by
control.  Because the Management Investors held key
positions on the board and in the management of Old
NMC, they were clearly in a position to influence the
board to recommend, and the shareholders of Old NMC to
approve, the transaction.

The Management Investors also had the ability significantly
to influence NMC Holding. ...

***

In addition, the chief negotiator for Old NMC (Dr. Hampers)
was also one of the Management Investors in NMC Holding.  He
was essentially negotiating on both sides of the
transaction.

*Id.* at 85.  The instant case regarding the transactions between

HRPT, HRPT Advisors, HRPT's sponsors, and CSC, is analogous to

the circumstances in *Kidney Center*.  Here, like the Court of

Appeals in that case, the Secretary's "reasonable interpretation

is entitled to our deference."  *Id.* (citation omitted).

**B.    The Exception to the Related Party Rule**

Plaintiff contends that the PRRB erred in its conclusion

that, even if HRPT and CSC are related parties, the criteria for

the exception found in 42 C.F.R. § 413.17(d) were not met.

The first of the four criteria for qualifying for the

exception, that the supplying organization is a bona fide

organization, is not disputed.  A.R. 15; Def. Mot. at 37.

As to the second criterion, however, whether a substantial

part of the supplying organization's business of the type carried
on with the Provider is with unrelated organizations and there is
an open, competitive market for the type of service supplied,
plaintiff notes that the PRRB focused on the wrong analysis. Pl.
Reply at 34-35.  The PRRB concluded that "the Providers assert
that a significant portion of their business activities were
transacted with unrelated organizations.  However, the Board
finds that the record contained no evidence to support the
Providers' assertions."  A.R. 15 (emphasis added).  Plaintiff
maintains that it is HRPT's business activities, not CSC's, that
should have been the focus of the analysis.  The defendant
appears to concede plaintiff's point.  Def. Mot. at 37 ("To the
extent that the PRRB focused on whether CSC transacted a
substantial part of their business with unrelated organizations
in resolving this issue, the Board arguably focused on an
extraneous issue.").

Nevertheless, the record appears to support a finding that
plaintiff did not satisfy its burden to show by "convincing
evidence to the satisfaction of the fiscal intermediary" that
HRPT did a significant portion of its business with unrelated
organizations and that there is an open and competitive market
for the type of services provided by HRPT.  42 C.F.R. §
413.17(d)(1),(d)(1)(ii).  The Intermediary concluded that in
1986, when the lease was negotiated, HRPT did not do a

substantial part of its business with unrelated parties.  A.R.
193.  Moreover, the Intermediary found that there is not an open,
competitive market for leasing nursing home facilities.  *See* A.R.
193-94, 477 (Intermediary's experience that most skilled nursing
facilities are owned, not leased.).  Finally, the PRRB concluded
that CSC had not submitted any evidence to show that they tried
to negotiate with any unrelated REITs for financing or capital
alternatives.  A.R. 15.

Finally, as to the fourth prong of the exception analysis,
whether the charges to the Provider were "in line" with charges
for those services on the open market, the PRRB cited a letter
from the Intermediary citing the former Intermediary's survey
that charges for the Forestville facility were several times
higher than charges for comparable SNF facilities in the
Hartford, Connecticut area.  A.R. 15, 477.  Plaintiff argues that
this survey should be given no weight because it was not offered
into evidence or produced or explained as part of the
administrative proceedings.  Pl. Mot. at 37.  The regulations
afford the plaintiff the opportunity to discover the underlying
methodology or other information about the Intermediary's
evidence.  42 C.F.R. § 405.1853(b).  However, plaintiff does not
submit evidence that they did so under the regulations.

Plaintiff also maintains that it introduced "substantial
evidence" that the rent under the leases to Continuing Health was

at the market rate.  Pl. Mot. at 36.  But the evidence plaintiff
cites is HRPT's own annual report, which is hardly objective
evidence of open market rates.  A.R. 1269.  In fact, that
document states

> [HRPT] has an agreement with [HRPT Advisors] whereby
> [HRPT Advisors] provides investment, management and
> administrative services to [HRPT]. [HRPT Advisors] is
> owned by Gerard M. Martin and Barry M. Portnoy, who
> also serve as Managing Trustees of the Company.
> Messrs. Martin and Portnoy are principal shareholders
> of [CSC], Connecticut Subacute Corporation II, New
> Hampshire Subacute Corporation and Vermont Subacute
> Corporation (collectively the 'Subacute Entitites') and
> were formerly directors of Horizon/CMS Healthcare
> Corporation ('Horizon') and Greenery Rehabilitation
> Group, Inc. ('Greenery'), which merged with Horizon in
> 1994.  Horizon and the Subacute Entities are lessees of
> [HRPT]. [HRPT} has extended a [$4 million] line of
> credit to CSC until June 30, 1997.  At December 31,
> 1996, there was [$2,365,000] outstanding under this
> agreement.  The lease and mortgage transactions with
> the Subacute Entities and Horizon are based on market
> terms and are *generally similar* to [HRPT's] lease and
> mortgage agreements with unaffiliated companies.  The
> former president of [HRPT] is the president of the
> Subacute Entities.  Mr. Portnoy is a partner in the law
> firm which provides legal services to [HRPT]. [HRPT
> Advisors] is the general partner of M&P, which provides
> management services for some of the [HRPT's] recently
> acquired medical office buildings.  The property
> management fees paid to M&P are generally equal to
> three percent of gross rents from the managed
> properties.

A.R. 1269.  Under the regulations, it is plaintiff's burden to
show convincing evidence that each of the four criterion are
satisfied.  The Court is unpersuaded by this evidence that the
PRRB was erroneous in concluding that the plaintiff had not
satisfied the fourth prong of the regulation that would have

entitled it to be excepted from the related party rule. 42 C.F.R. § 413.17(d).

While portions of the PRRB's analysis of the related party rule's exception under 42 C.F.R. § 413.17(d) may have been flawed, this Court does not need to reverse its decision if the record otherwise supports the conclusion and the outcome would not be different if the correct analysis had been applied. *See, e.g., DSE, Inc. v. United States,* 169 F.3d 21, 31 (holding that under the APA, agency decisions will not be set aside unless the plaintiff can demonstrate that it was prejudiced and that to do otherwise would be "empty formality"); *Salt River Project Agric. Improvement and Power Dist. v. United States*, 762 F.2d 1053, 1060-61 n.8 (D.C. Cir. 1985)(holding that "[w]hen an agency relies on a number of findings, one or more of which are erroneous, we must reverse and remand only when there is a significant chance that but for the errors the agency might have reached a different result" and that "[w]hen it is clear that based on the valid findings the agency would have reached the same ultimate result, we do not improperly invade the administrative province by affirming."). Here, particularly where plaintiff must satisfy all four criteria to meet the related party rules exception, the record supports the PRRB's conclusion and there is no reason to think that a different result would have been reached but for any errors cited by

plaintiff.

**C.    Whether CSC was Entitled to Some Reimbursement for
       Reasonable Costs After Application of the Related Party Rule**

Finally, plaintiff insists that even if the related party
rule was correctly applied and it failed to qualify for the
exception, CSC was still entitled to some reimbursement for
costs.  Apparently, the Intermediary and the Board both agreed
that even after application of the related party rule, Providers
can recover certain costs, such as costs to the related party.
A.R. 15.  According to the PRRB, the reason plaintiff was unable
to recover any costs is its failure "to submit any documentation
of ownership costs," required under the Medicare regulations, 42
C.F.R. §§ 413.20(a) and 413.24(a).  A.R. 15.

The regulations provide that

> The provider must make available to the intermediary
> when requested adequate documentation to support the
> costs incurred by the related organization, including,
> when required, access to the related organization's
> books and records, attributable to supplies and
> services furnished to the provider.  Such documentation
> must include an identification of the organization's
> total costs, the basis of allocation of direct and
> indirect costs to the provider, and other entities
> served.

PMR § 1005.  The record reflects that the Intermediary requested
such documentation at least once and gave the Providers ample
opportunity to provide that information.  *See, e.g.,* A.R. 476-77
(Letter dated August 19, 1998)("Lastly, both of the Audited
Financial Statements for Connecticut Subacute and for HRPT

indicate that the rental arrangement is through a related party. With this information, please submit an analysis of the actual cost to the related party for depreciation on capital items.  We will adjust to bring the rent expense onto Worksheet A-8-1 column 4 and the actual cost on column 5.").

Plaintiff cites *Richlands Med. Ass'n v. Harris*, 651 F.2d 931 (4th Cir. 1981) and submit that they are entitled to reimbursement rate at the level of the market rate in 1986, plus interest.  This argument is unavailing for several reasons. First, as defendant persuasively argues, *Richlands* applied the incorrect standard of deference, may not be good law in the 4th Circuit, and is inconsistent with this Circuit's caselaw, such as *Kidney Center*, 133 F.3d at 86.  *See* Def. Reply at 18-21 (citing numerous cases issued by the Supreme Court and the 4th Circuit Court of Appeals since *Richlands* that undermine *Richland's* holding).

Perhaps more importantly, the PRRB's decision that plaintiff would recover no costs was based on plaintiff's failure to submit documentation of those costs and failure to comply with the record keeping provisions, not a disagreement that plaintiff would be entitled to cost reimbursement had it documented those costs.  Plaintiff maintains that it submitted documentation of the Trust's depreciation of the facilities, and cites to a letter counsel sent to the Intermediary, attaching HRPT's financial

information.  Pl. Reply at 20 (citing A.R. 260-306).  A reading

of the letter, however, indicates that this documentation was

only submitted for purposes of showing that the related party

rule did not apply or, without admitting relatedness, to address

why the exception of PMR § 1010 should apply.  A.R. 260-262.

Thus, it is perhaps not surprising that the Intermediary

acknowledged receipt of that information, but again requested an

analysis of the actual costs.  A.R. 501, 564-65.  In sum, the

record supports the PRRB's conclusion that plaintiff had not

complied with its duty to provide documentation necessary to

support reimbursement.

## IV.  Conclusion

As this Court has said,

"It is well settled ... that the Secretary's decisions
interpreting the Medicare Act are entitled to 'great
deference.' " *See Sentara-Hampton General Hosp. v.
Sullivan,* 980 F.2d 749, 755 (D.C. Cir. 1992)(citation
omitted). "Our limited role is to ensure that the
Secretary's regulations are consistent with the
statute, reasonably interpreted and consistently
applied ... [and] to ensure that the findings in
particular cases are not arbitrary and capricious and
are supported by substantial evidence." *Villa View
Community Hospital, Inc. v. Heckler,* 728 F.2d 539, 543
(D.C.Cir. 1984). We are not permitted to substitute our
judgment for that of the agency. *Lloyd Noland Hosp. and
Clinic v. Heckler,* 762 F.2d 1561, 1565 (11th Cir.
1985).

*Nat'l Med. Enter., Inc. v. Shalala,* 826 F.Supp. 558, 560 -561

(D.D.C. 1993).  Nothing in the record persuades this Court that

the Secretary acted arbitrarily or capriciously or that his

decision was not supported by substantial evidence in concluding

that CSC was not entitled to reimbursement.  Therefore,

defendant's motion is **GRANTED** and plaintiff's cross motion is

**DENIED** and this case is **DISMISSED WITH PREJUDICE.**  An appropriate

Order accompanies this Memorandum Opinion.


**Signed:     Emmet G. Sullivan**
             **United States District Judge**
             **September 29, 2005**